UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALIKI FOODS, LLC, | : |
| | : |
| Plaintiff, | : |
| | : No. 3:08cv626 (MRK) |
| v. | : |
| | : |
| OTTER VALLEY FOODS, INC., | : |
| | : |
| Defendant. | : |

## RULING AND ORDER

Pending before the Court is the Motion for Partial Summary Judgment [doc. # 67] of Defendant Otter Valley Foods, Inc. ("Otter Valley"), requesting summary judgment on Count Two of the Second Amended Complaint of Plaintiff Aliki Foods, LLC ("Aliki"). Otter Valley argues that Count Two, alleging negligence, is barred by the economic loss doctrine, as articulated by the Connecticut Supreme Court in *Flagg Energy Development Corporation v. General Motors Corporation* ("*Flagg Energy*"), 244 Conn. 126, 154-55 (1998), meaning that Aliki is limited to its contractual remedies. *See generally* Def.'s Mem. in Supp. of Mot. for Partial Summ J. [doc. # 67-1]. For the reasons explained below, the Court agrees, and therefore grants Otter Valley's motion for summary judgment as to Count Two of Aliki's Second Amended Complaint.

**I.**

The facts of this case are straightforward and mostly uncontested, with a few key exceptions. Plaintiff Aliki, a Connecticut LLC, is a frozen foods company; it sells frozen sandwiches, meal entrees, and pizzas, primarily to food wholesalers such as Sam's Club, Costco, and BJ's Wholesale Club ("BJ's"). Aliki, however, does not manufacturer what it sells. Instead, it contracts with other

1

companies, including the Defendant, a Canadian company, to purchase and, where necessary, import the food. Sometime in September 2003, Aliki engaged with Otter Valley to manufacture two products, including Fettuccini Alfredo with Chicken and Broccoli (referred to by the parties as "FACB"). Although the parties drafted a contract, it was never signed and important parts of it were left blank. *See* Draft Agreement dated Sept. 30, 2003, Ex. C to the Pappas Aff. in Opp'n to Def.'s Mot. [doc. # 87-6]. Nonetheless, the parties agree that they entered into an agreement whereby Otter Valley agreed to manufacture, package, and label two Aliki products (including the fettuccine alfredo), and that Otter Valley performed its obligations under the terms of the agreement for several years. *See* Second Am. Compl. [doc. # 30] ¶¶ 8, 12; Def.'s Answer [doc. # 35] ¶¶ 8, 12.

On or about September 25, 2007, Aliki ordered 880 cases of the product to be delivered to a BJ's distributor in Maryland, Burris Logistics ("Burris"), *see* Purchase Order, Ex. 2 to Def.'s 56(a)1 Statement [doc. # 68-3], and another 880 cases to be delivered to another BJ's distributor in Massachusetts, C&S Wholesalers ("C&S"); *see* Purchase Order, Ex. 3 to Def.'s 56(a)1 Statement [doc. # 68-4]. On or about October 3, 2007, an Otter Valley transport truck containing the shipment of the product en route to Burris was stopped at the U.S.-Canadian border by inspectors of the U.S. Department of Agriculture (USDA). At the stop, the USDA inspectors took a sample of the food and placed a "hold" on the product shipment. Thereafter, the truck proceeded to Burris (which Aliki alleges it should not have done), and the product was delivered to Burris that same day. It is undisputed that Otter Valley emailed Mike Pappas, the President of Aliki, to inform him of the USDA "hold" on October 3, 2007, but a primary dispute between the parties is when Mr. Pappas became aware of the hold; Aliki says he did not receive the email until several days later because Mr. Pappas was travelling.

On or about October 7, 2007, the USDA informed Otter Valley that a test returned a "presumptive positive" result for the bacteria *Listeria monocytogenes* ("Listeria"). It is not clear what Otter Valley did with this information, but it is undisputed that Burris informed Mr. Pappas the following day, October 8, of the preliminary Listeria test results, and that by this time some 75 cases of the product had already been distributed to BJ's store locations. Mr. Pappas then contacted the BJ's locations and had BJ's pull the product. On October 9, 2007, the USDA contacted Aliki and told it that the product should be recalled; both Aliki and the USDA issued press releases that day announcing the voluntary recall. *See* Press Releases, Exs. H & I to the Pappas Aff. in Opp'n to Def.'s Mot. [doc. # 87-6]. Around the same time, Aliki discovered that the Otter Valley delivery of fettuccine alfredo to C&S on October 4 was from the same production run as that which tested positive for Listera. Aliki alleges, but Otter Valley denies, that it should have, but did not, inform Aliki of this fact earlier. Aliki's negligence claim is based upon this alleged failure to inform. *See* Second Am. Compl. [doc. # 30] ¶ 40(d).[1] After notifying the USDA, Aliki expanded the voluntary recall to states beyond Maryland.

Aliki also alleges that on or about October 9, Otter Valley's Director of Q&A, Colleen Jameson-Homme, contacted Mr. Pappas to tell him that Otter Valley had submitted the wrong form to the USDA, mistakenly identifying the food as "ready to eat" instead of "cook to eat," resulting in the USDA testing the food for Listeria. The USDA apparently does not test "cook to eat" food for

---

[1] Aliki's negligence claim, as pleaded in the Second Amended Complaint, also includes allegations that Otter Valley failed to properly label the product and that it was negligent in submitting the wrong applications to the USDA for approval. *See* Second Am. Compl. [doc. # 30] ¶¶ 40(a)-(c). In opposing Otter Valley's motion for summary judgment on its negligence count, however, Aliki has argued only that the allegations concerning Otter Valley's mishandling of the USDA "hold" state a valid tort claim. *See* Pl.'s Objection to Def.'s Mot. [doc. # 86] at 1 ("The relevant allegations for purposes of Aliki's objection are contained at Par. 40(d) . . . ."). Accordingly, the Court considers

Listeria, as it is killed in cooking. Aliki also alleges that Otter Valley submitted the packaging to the USDA without the USDA-required "cook thoroughly" printed on it; whether Otter Valley was responsible for the packaging is another primary dispute in this case. On or about October 31, virtually all of the product subject to the USDA recall was destroyed, and on November 19, 2007, the USDA closed its file on the case.

Aliki filed suit on April 25, 2008, for breach of contract and negligence against Otter Valley, alleging lost sales and profits, including the loss of future earnings due to the harm to its reputation. *See* Compl. [doc. # 1]. On June 30, 2008, Aliki filed an amended complaint, adding a claim of breach of implied warranty and allegations that BJ's and/or C&S discontinued sales of Aliki's fettuccine alfredo and two of its other product lines as a result of the recall. *See* Am. Compl. [doc. # 4] ¶¶ 33, 35. Thereafter, on September 10, 2008, Otter Valley filed a motion to dismiss Count Two of the Amended Complaint (the negligence claim) on the basis of the economic loss doctrine. *See* Def.'s Mot. to Dismiss [doc. # 21]. Aliki filed a Memorandum in Opposition to the Motion to Dismiss [doc. # 25], but it also filed a second amended complaint on October 30, 2008, which made a handful of changes. *See* Second Am. Compl. [doc. # 30]. Among other changes, the new complaint added factual allegations that, over time, the terms of the parties' agreement "evolved" such that, by August 2006, Aliki would periodically send Otter Valley a "blanket purchase order" specifying some large number of cases of product to be prepared over the subsequent few months, *see id.* ¶ 10, but that Otter Valley would not actually deliver any product until it received further documentation from Aliki; *see id.* ¶ 11; *see also* Sample "Blanket Purchase Order" dated Dec. 2006, Ex. D to the Pappas Aff. in Opp'n to Def.'s Mot. [doc. # 87-6]. The Second Amended Complaint

only those allegations identified by Aliki as relevant to the motion in this opinion.

also changed the wording of Aliki's negligence claim against Otter Valley, removing all references to the existence of a contract. *See* Second Am. Compl. ¶ 40.

The Court held an on-the-record telephonic conference with the parties on November 4, 2008 to discuss the partial motion to dismiss. During the call, the Court explained that it believed it more appropriate to handle the issue of the economic loss doctrine in the context of a motion for summary judgment. Defendant Otter Valley conceded that if it was determined that there was no contract between the parties – an issue of fact – the doctrine would not apply, and Aliki would not be limited to purely contractual remedies. Following the phone conference, the Court issued an order denying Otter Valley's partial motion to dismiss, but without prejudice to renewal in the context of a summary judgment motion. *See* Order [doc. # 31]. Otter Valley's pending motion for partial summary judgment, filed December 1, 2009, is essentially a renewal of its earlier motion to dismiss.

## II.

The summary judgment standard is a familiar one. Granting summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

As the moving party, Otter Valley bears the burden of demonstrating that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). Aliki, as the nonmovant, is entitled to have all ambiguities resolved and all inferences drawn in its favor. *See Anderson*, 477 U.S. at 255; *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). However, if Otter Valley carries its burden, Aliki "may not rely merely on allegations or denials" to survive summary judgment. Fed. R. Civ. P. 56(e)(2). Rather, to successfully defeat the motion for partial summary judgment, Aliki must "set out specific facts," supported by admissible evidence, that show "a genuine issue for trial." *Id*. As the Supreme Court has put it in oft-quoted language, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III.

"The economic loss doctrine is a judicially created doctrine which bars recovery in tort where the relationship between the parties is contractual and the only losses alleged are economic." *Smith Craft Real Estate Corp. v. Handex of Conn., Inc.*, No. CV030082188S, 2004 WL 1615896, at *3 (Conn. Super. Ct. June 25, 2004) (citation omitted); *see also Flagg Energy*, 244 Conn. at 154-55 (applying the doctrine). While simply stated, the doctrine and relevant case law can be confusing. *See, e.g.*, *Santoro, Inc. v. A.H. Harris & Sons, Inc.*, No. CV030828039S, 2004 WL 2397155, at *4 (Conn. Super. Ct. Sept. 23, 2004) ("With due respect to the parties, neither appears to have correctly understood or applied the Supreme Court's controlling opinion in *Flagg*."); *Milltex Properties v. Johnson*, No. 565866, 2004 WL 615748, at *4 (Conn. Super. Ct. Mar. 15, 2004) ("The Superior

Courts have been divided as to whether the doctrine truly has been adopted in Connecticut and if it has, when to apply the doctrine."); *Reynolds, Pearson & Co., LLC v. Miglietta*, No. CV000801247, 2001 WL 418574, at *4 (Conn. Super. Ct. Mar. 27, 2001) ("There is inconsistency in the decisions of Superior Court judges regarding the applicability of the economic loss doctrine in Connecticut."). For that reason, and for the sake of clarity, the Court finds it useful to discuss here a few of the doctrine's principles.

The doctrine arose principally in the context of product liability, "where the economic losses are essentially contractual in nature, and therefore the risk may be allocated by the parties." *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 18 (2d Cir. 2000) (citation omitted). The Supreme Court, in adopting the economic loss doctrine for general maritime law, explained that:

> Contract law . . . is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power, we see no reason to intrude into the parties' allocation of the risk.

*East River S.S. Corp v. Transamerica Delaval, Inc.*, 476 U.S. 858, 872-73 (1986) (citations omitted). The economic loss doctrine, in essence, holds the aggrieved party to the bargain it struck in its contract by preventing it from bringing a tort action for what is really the breach of a contractual duty. This protects the parties' expectancy interests and encourages them to build cost considerations into their contracts in the first place. *See generally BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004) (explaining the policy reasons for the doctrine); *see also Hartford Fire Ins. Co. v. Leninski*, No. CV970396097S, 2002 WL 31513608, at *3 (Conn. Super. Ct. Oct. 29, 2002) ("Allowing tort claims for what is essentially a breach of contract would cause tort law to swallow up the body of common law surrounding contracts, including the appropriate measure of

7

damages.") *Princess Cruises, Inc. v. Gen. Elec. Co.*, 950 F. Supp. 151, 156 (E.D. Va. 1996) ("[T]o permit a party to a broken contract to proceed in tort where only economic losses are alleged would eviscerate the most cherished virtue of contract law, the power of the parties to allocate the risks of their own transactions.").

Nonetheless, there are limits and exceptions to the economic loss doctrine. One is that the doctrine only applies in situations where the injured party alleges purely economic losses relating to the goods themselves. Thus, the economic loss doctrine does not generally bar recovery in tort if the plaintiff alleges either personal injury or damage to property other than the goods for which the parties contracted. *See, e.g.*, *Cornwall Bridge Pottery, Inc. v. Sheffield Pottery, Inc.*, No. 07CV1154, 2008 WL 906833, at *3 (D. Conn. Apr. 2, 2008). This differential treatment is based on the different purposes served by contract and tort law:

> The tort concern with safety is reduced when an injury is only to the product itself. When a person is injured, the cost of an injury and the loss of time or health may be an overwhelming misfortune, and one the person is not prepared to meet. In contrast, when a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs . . . . Losses like these can be insured. Society need not presume that a customer needs special protection. The increased cost to the public that would result from holding a manufacturer liable in tort to injury to the product itself is not justified.

*East River*, 476 U.S. at 871-72 (citations and quotation marks omitted); *see also Mountain West Helicopter, LLC v. Kaman Aerospace*, 310 F. Supp. 2d 459, 465-66 (D. Conn. 2004) ("[E]conomic losses resulting from a product failure are barred because they do not implicate the safety concerns of tort law.").

A second limitation of the doctrine is that it generally applies only to contracts for the sale of goods, the origin of which "lies *not* in the broad common law of torts or contracts, but in the

narrower, express provisions of Article 2 of the Uniform Commercial Code, which establishes special rules governing the remedies available for breaches of commercial contracts for the sale of goods." *Santoro*, 2004 WL 2397155, at *4; *see also Flagg Energy*, 244 Conn. at 154-55 (explaining why a negligent misrepresentation claim is inconsistent with other claims arising under Article 2 of the UCC). Thus, the economic loss doctrine does not typically apply to tort claims arising out of a contract for services. *See, e.g.*, *Smith Craft Real Estate Corp.*, 2004 WL 1615896, at *4 ("There is no allegation that the plaintiff's alleged damages resulted from the sale of a defective product. Therefore, the plaintiff's tort claims for economic loss are legally sufficient.").

Of course, many contracts involve so-called "hybrid transactions," under which the seller supplies both goods and services. In that situation, whether the contract is governed by the UCC's provisions regarding the sale of goods – and thus subject to the economic loss doctrine – becomes a question of "whether the dominant factor or 'essence' of the transaction is the sale of the materials or the services." *Nora Beverages, Inc. v. Perrier Group of Am.*, 164 F.3d 736, 747 (2d Cir. 1998) (quoting *Incomm, Inc. v. Thermo-Spa, Inc.*, 41 Conn. Supp. 566, 570 (Conn. Super. Ct. 1991)). In the absence of a dispute of material fact regarding the terms of the agreement, Connecticut law treats the "dominant factor" test as a question of law for the court to determine. *See, e.g.*, *Incomm*, 41 Conn. Supp. at 570; *Myrtle Mills Assocs. v. Bethel Roofing, Inc.*, No. 29-87-34, 1993 WL 382305, at *2 (Conn. Super. Ct. Sept. 14, 1993); *see also Cornwall Bridge Pottery*, 2008 WL 906833, at *2; *Connie Beale, Inc. v. Plimpton*, No. FSTCV085008751S, 2010 WL 398903 (Conn. Super. Ct. Jan. 13, 2010) (determining, on a motion to strike, the "dominant factor" of a contract).

However, even when these requirements are met – and a plaintiff alleges purely economic losses related to a contract for the sale of goods – courts have, to varying degrees, carved out

exceptions to the economic loss doctrine. One such exception is for intentional torts, such as fraud. *See, e.g.*, *Dunleavey v. Paris Ceramics USA, Inc.*, No. CV020395709S, 2005 WL 1094424, at *7 (Conn. Super. Ct. Apr. 30, 2005). This exception is premised on at least two justifications. First, the possibility of tort liability could serve as an additional deterrent to the commission of intentionally wrongful acts; and second, it could permit the aggrieved party to recover damages not contemplated when drafting the contract due to that party's reasonable expectation that the other party would not intentionally cause it injury.

That said, courts are careful to distinguish an intentional tort from an intentional breach of the contract. In the latter situation, the bargained-for contract remedies should sufficiently compensate the injured party. Moreover, "[a]lmost every breach of contract involves actions than can be conceived of as a negligent or intentional tort." *Princess Cruises*, 950 F.Supp. at 156. This task of looking beyond the labels and adjectives asserted by counsel to ascertain the gravamen of a claim is similar to what courts already do in related contexts. *See, e.g.*, *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 747 (2d Cir. 1979) (rejecting the argument that the plaintiff had wrongfully pleaded a simple breach of contract claim as a fraud claim in order to take advantage of the latter's longer statute of limitations, and explaining that the case "does not involve an[] attempt to dress up a contract claim in a fraud suit of clothes. . . . [the plaintiff] clearly alleges fraud that was extraneous to the contract, rather than a fraudulent nonperformance of the contract itself"); Ruling and Order [doc. # 62], *GJN Advisors, Inc. v. Woolrich, Inc.*, No. 3:09CV338(MRK) (D. Conn. Jan. 20, 2010) at 2-4 (holding that although the plaintiff had successfully pleaded a breach of contract claim, it had not adequately pleaded a violation of the Connecticut Unfair Trade Practices Act – which requires substantial aggravating circumstances attending the breach – because "when one puts

[the plaintiff's] adjectives to the side, and assesses the facts alleged . . . . this is a case in which [the plaintiff] alleges [only] that [the defendant] committed an intentional breach of contract").

Another exception to the economic loss doctrine that some jurisdictions, including New York, recognize permits recovery under a tort theory if the duty breached arose "from a special relationship that requires the defendant to protect against the risk of harm to plaintiff." *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctro., Inc*., 96 N.Y. 2d 280, 289 (2001).  "Professionals, common carriers and bailees, for example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties.  In these instances, it is policy, not the parties' contract, that gives rise to a duty of due care." *Sommer v. Federal Signal Corp*., 79 N.Y.2d 540, 551-2 (1992) (citations omitted); *see also Trs. of Columbia Univ. v. Gwathmey Siegel & Assocs. Architects*, 601 N.Y.S.2d 116, 119 (N.Y. App. Div. 1993) ("[S]eparate tort liability [] can arise independently of the contractual relationship between the parties where the nature of the performance called for is affected with a significant public interest and failure to perform the service carefully and competently can have catastrophic consequences.") (citation and quotation marks omitted).  While well-developed in the New York courts, few Connecticut courts, if any, have had occasion to consider this exception.

Finally, some Connecticut trial courts, hewing closely to the facts in *Flagg Energy*, have limited the economic loss doctrine to situations where both the plaintiff and the defendant are sophisticated commercial parties. *See, e.g.*, *Santoro*, 2004 WL 2397155, at *4; *Milltex Props.*, 2004 WL 615748, at *2 ("[W]hen the parties are sophisticated corporations they are capable of negotiating contractual terms regarding the risk of loss."); *Morganti Nat., Inc. v. Greenwich Hosp. Ass'n*, No. X06CV990160125, 2001 WL 1249807, at *1 (Conn. Super. Ct. Sept. 27, 2001)

11

(describing the use of the economic loss doctrine as "most compelling" when, *inter alia*, "the parties are sophisticated corporations").

With these principles in mind, the Court turns to the merits of Otter Valley's argument that Aliki's negligence claim is barred by the economic loss doctrine.

**IV.**

In this case, there is no dispute that Aliki is alleging purely economic losses, *see* Pl.'s Local R. 56(a)2 Statement [doc. # 87-5] ¶¶ 6-7, and that it is not alleging any intentional wrongdoing on the part of Otter Valley. Prior to oral argument, there also seemed to be no genuine dispute that the parties were generally acting pursuant to a contractual relationship – albeit one whose exact terms were somewhat ambiguous. Nonetheless, Aliki has advanced three arguments for why the economic loss doctrine does not apply to bar its negligence claim. As explained below, each is unavailing.

First, Aliki argues that its negligence count is not barred because a jury could find for it even if it found that Otter Valley did not breach any contract between the parties. *See* Pl.'s Mem. in Supp. of Objection to Def.'s Mot. ("Pl.'s Mem. Opp'n") [doc. # 87-1] at 6-8. In particular, Aliki says that even if it cannot prove that the food was actually contaminated with Listeria, a jury could still find that Otter Valley was negligent in not informing the C&S Warehouse in Massachusetts of the presumptive positive test for the bacteria. *See id.* at 7-8. Second, Aliki argues that its allegations regarding the "negligent failure to inform" claim "go beyond a sale of goods transactions under the UCC," and thus do not trigger the economic loss doctrine. *Id.* at 9.

During oral argument on the motion, Aliki made a third argument, suggesting that summary judgment as to its negligence claim ought to be denied on account of the ambiguities surrounding the parties' contractual relationship. Relevant to this argument is Aliki's factual assertion that the

12

product it ordered from Otter Valley remained the property of Defendant even after it was delivered to either Burris or C&S, up until it was physically pulled from the warehouse and shipped to BJ's. *See* Pappas Aff. [doc. # 87-6] ¶¶ 9, 11. As mentioned previously, the parties had drafted an agreement in 2003, but had never signed it. Counsel for Plaintiff suggested that a jury could conclude that a contract between the parties was not formed until Aliki performed its end of the bargain by pulling the product from the warehouse for delivery to the individual retail stores. In this case, the allegedly contaminated product was not pulled from the Burris warehouse until either the 7th or 8th of October, 2007; yet Aliki's negligence claim would have arisen when Otter Valley was informed of the USDA "hold" on October 3, 2007. Plaintiff's counsel argued that if a contract was not formed until after the negligence claim arose, the economic loss rule would not preclude Aliki's negligence claim. Following oral argument, the Court permitted the parties to file supplemental briefs to address this issue, *see* Order [doc. # 90], which they did. *See* Def.'s Supplemental Mem. in Supp. of Mot. for Partial Summ. J. [doc. # 97]; Pl.'s Supplemental Mem. in Opp'n to Mot. for Partial Summ. J. [doc. # 99].

Aliki is correct that the elements it would have to prove for a negligence claim are different from that of a breach of contract claim, and that the former could succeed even where the latter fails. But this is hardly a reason for concluding that the economic loss doctrine does not apply. If anything, this argument highlights the doctrine's necessity by illustrating one of the incentives for a party to attempt to circumvent its contractual obligations. Moreover, this is hardly a situation where Aliki failed to consider the possibility of non-conforming goods, as demonstrated by the agreement drafted by the parties in 2003. *See* Draft Agreement dated Sept. 30, 2003, Ex. C to the Pappas Aff. in Opp'n to the Mot. for Part. Summary J. [doc. # 87-6]. Although never signed and incomplete in

many material respects, the draft contract shows what terms the parties were considering. For example, although left blank, Exhibit B to the draft contract is entitled "Quality and Control Specifications for [Aliki] Products." The draft agreement stated that Otter Valley would manufacture and package the products in accordance with these specifications, s*ee id.* ¶ 1, and that Otter Valley would give Aliki certain warranties regarding the product, *see id.* ¶ 5. It also contained a provision on indemnification, *see id.* ¶ 7, whereby Aliki would have indemnified Otter Valley for any claim caused by any product that met the specifications in the contract, as well as for "any claim which is caused by [Aliki's] mishandling of the Product," *id.* ¶ 7(b). There is no comparable indemnification provision in the draft contract concerning claims arising out of Otter Valley's "mishandling" of the product. A jury will determine whether the parties ultimately intended to incorporate these or other provisions regarding who bore what risk into their contractual relationship, *see Presidential Capital Corp. v. Reale*, 231 Conn. 500, 507 (1994), but no matter what the jury finds, the Courts "see[s] no reason to intrude into the parties' allocation of the risk," *East River*, 476 U.S. at 73.

Aliki's second argument – that its "negligent failure to inform" claim is not based on the sale of goods – relies on a mischaracterization of the "dominant purpose" test. Aliki seems to want to sever the service portion of the contract – the delivery of the product – and say it is not under Article 2 of the UCC. This it cannot do. If the "dominant purpose" of the contract as a whole was for the sale of goods, then the entire agreement is governed by Article 2. *See Incomm*, 41 Conn. Supp. at 570; *Myrtle Mills Assocs.*, 1993 WL 382305, at *2; *see also Cornwall Bridge Pottery*, 2008 WL 906833, at *2.

"Goods," under Connecticut law, are defined as "all things, including specially manufactured

14

goods, which are movable at the time of identification to the contract for sale . . . ." Conn. Gen. Stat. § 42a-2-105(1). While there are disputes of fact about some of the terms of the contract between these parties – in particular, which party was responsible for designing the product packaging and who assumed what risk with regards to product that failed FDA tests – even if the terms were as Aliki claims, this does not change the primary purpose of the agreement, which Aliki never disputes was for the sale of goods. Therefore, the Court can make this determination as a matter of law. *See Cambridge Plating Co., Inc. v. Napco, Inc.*, 991 F.2d 21, 24 (1st Cir. 1993) ("[Apellant] contends that the district court erred in ruling as a matter of law that the contract with [Appellee] was a sale of goods contract within the scope of the UCC. Although determining the type of contract at issue typically may be a jury function, we believe the facts here are sufficiently clear and undisputed that the district court was permitted to make its finding as a matter of law.") (citation omitted).

Even taking the facts in the light most favorable to Aliki's position, the inescapable conclusion is that the predominant or "essential" purpose of the contract was the sale of goods – the frozen food products that Otter Valley manufactures and that Aliki sells to retail establishments. The contractual terms on labeling, packaging, and delivering the product (assuming they exist) are all ancillary to the production and sale of the product itself. Therefore, the entire contract is governed by Article 2, Aliki's argument to the contrary notwithstanding. *See Fab-Tech, Inc. v. E.I. du Pont de Nemours & Co.*, 311 Fed. Appx. 443, 445 (2d Cir. 2009) ("While the agreements also contain provisions concerning exclusivity, marketing, delivery, and other arguably service-related matters, these matters are all incidental to the sale of DuPont's coating product."); *cf. Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974) (explaining the test for determining whether Article 2 covers hybrid contracts as "whether their predominant factor, their thrust, their purpose, reasonably stated,

is the rendition of service, with goods incidentally involved (*e.g.*, contract with artist for painting) or is a transaction of sale, with labor incidentally involved (*e.g.*, installation of a water heater in a bathroom).") (footnotes omitted).

The third argument for permitting Aliki's negligence claim to move forward – that a jury could find that there was no contract between these parties until Aliki actually pulled the product from the warehouse – is without support in either law or fact. First, under Connecticut law:

> Unless otherwise unambiguously indicated by the language or circumstances . . . an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship *or by the prompt or current shipment of conforming or nonconforming goods*.

Conn. Gen. Stat. § 42a-2-206(1). Here, the undisputed evidence is that Aliki ordered the product in question on September 27, 2007. *See* Purchase Order, Ex. 2 to Def.'s 56(a)1 Statement [doc. # 68-3]; Purchase Order, Ex. 3 to Def.'s 56(a)1 Statement [doc. # 68-4]. It is further undisputed that Otter Valley shipped the goods on or before October 3, 2007, *see* Second Am. Compl. [doc. # 30] ¶ 13, constituting an acceptance. Thus, at the latest, a contract was formed when Otter Valley shipped the product – which is before Aliki's negligence claim would have arisen. Aliki's argument that title to the goods not pass to it until several days later is of no consequence, since it does nothing to change the date on which the contract for the sale of goods was formed. *See* Conn. Gen. Stat. § 42a-2-401(1) (providing that the formation of a contract and the passage of title are distinct).

Additionally fatal to Aliki's argument is that its director, Michael Pappas, submitted an affidavit that explains, in significant detail, how the parties entered into a contractual relationship in September 2003; how that agreement evolved over time; and why he believes Otter Valley breached it. *See, e.g.*, Pappas Aff. in Opp'n to Def.'s Mot. [doc. # 87-6] ¶ ("Some time in September of 2003, Aliki entered into an agreement (the 'Agreement') with Otter Valley to manufacture, package and

16

label certain products, including, but not limited to . . . Aliki Fettuccine Alfredo with Chicken and Broccoli; the ('Product')."). Aliki has presented no evidence – either through Mr. Pappas or otherwise – that even suggests that there was no contract as of September 2003, much less enough evidence that could lead a reasonable jury to the same conclusion.

In sum, there is no genuine dispute of material fact that Otter Valley undertook the production and delivery of the allegedly contaminated fettuccine alfredo pursuant to an agreement with Aliki. The exact terms of that agreement and whether Otter Valley breached them will be matters for the jury to determine; but should the jury find Otter Valley liable, Aliki will be limited to the bargained-for contract remedies.

## V.

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment [doc. # 67] is GRANTED, and the Defendant is granted summary judgment on Count Two of the Second Amended Complaint [doc. # 30]. Count One, alleging breach of contract, and Count Three, alleging breach of implied warranty, remain for trial.

IT IS SO ORDERED.

/s/  Mark R. Kravitz
United States District Judge

**Dated at New Haven, Connecticut:  March 26, 2010.**